**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

PAUL A. FIORAVANTI, JR.
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

November 17, 2020

Ms. Andrea C. Beck
260 Golden Plover Drive
Bombay Woods
Smyrna, DE 19977

Brian Thomas McNelis, Esquire
Young & McNelis
300 South State Street
Dover, DE 19901

Jason C. Powell, Esquire
The Powell Firm, LLC
1201 N. Orange Street, Ste. 500
Wilmington, DE 19801

John A. Greim
BWMC
P.O. Box 133
Smyrna, DE 19977

RE:  *Andrea C. Beck v. John A. Greim c/o Bombay Woods Maintenance Corp.*,
Civil Action No. 10223-MG

Dear Ms. Beck, Mr. Greim, and Counsel:

This Letter Opinion addresses *pro se* Petitioner Andrea Beck's exceptions to

the Master's final report dated May 29, 2020 ("Master's Final Report"), which

recommended approving the bylaws of the Bombay Woods Maintenance

Corporation.  For the reasons stated herein, the exceptions are denied, and the bylaws

are approved.

## I.     Background and Procedural History

Bombay Woods is a subdivision consisting of 152 single-family houses in Smyrna, Delaware.[1] The subdivision is managed by the Bombay Woods Maintenance Corporation ("BWMC").  BWMC is a Delaware nonstock corporation and is governed by a board of directors (the "Board").[2]  On October 10, 2014, Ms. Beck filed a complaint alleging various acts of malfeasance by the Board.  Since then, there have been significant disputes relating to the makeup of the Board and whether Board members have properly executed their duties.[3]

With the hope of finally resolving these disputes, the Court entered an order on April 23, 2019 (the "April 23, 2019 Court Order"), providing for an election of the Board to be held on May 30, 2019, under the oversight of a Special Master.[4] The election was held as ordered.[5]

The April 23, 2019 Court Order further provided that, following the election, the Board should schedule a meeting of the members of BWMC ("Members") to

---

[1] Docket Item ("D.I.") 196, at 1.

[2] D.I. 1, Exhibit 16.

[3] A more extensive history of these disputes can be found in *Beck v. Greim*, 2018 WL 4938783, at *1–*3 (Del. Ch. Oct. 11, 2018).

[4] April 23, 2019 Court Order, D.I. 190.

[5] D.I. 200, ¶ 13.

"hold a vote on the adoption of by-laws or otherwise confirm and ratify the [existing] By-Laws pursuant to Delaware law (to the extent necessary)."[6] The Court ordered that the bylaws, whether ratified or newly adopted, "shall be submitted to the Court for approval and noticed to the [Members] for objection and upon Court approval, shall be recorded and governing BWMC notwithstanding any document or filing to the contrary."[7]

The Members adopted new bylaws at a meeting held on October 24, 2019.[8] Notice of the meeting was given to all 152 homes in Bombay Woods, and 38 Members attended the meeting. All 38 votes were cast in favor of the proposed bylaws.[9] The bylaws were then presented to the Court on November 8, 2019,[10] and the Court ordered the bylaws to be served on all Members with notice that objections to the bylaws must be filed with the Court by December 12, 2019.[11] Ms. Beck submitted objections to the bylaws on December 4, 2019, challenging the validity of

---

[6] April 23, 2019 Court Order, ¶ 16.

[7] *Id.*, ¶ 17.

[8] D.I. 222, at 2.

[9] *Id.*

[10] D.I. 211.

[11] D.I. 212.

various provisions in the bylaws as well as the procedures for their adoption.[12] The Court did not receive any other objections. On January 24, 2020, Respondent John Greim, President of BWMC, submitted comments to the Court defending the process by which BWMC adopted the bylaws.[13] Ms. Beck replied with an additional submission on February 24, 2020.[14]

On May 29, 2020, Master Griffin issued the Final Report on Ms. Beck's objections to the bylaws.[15] The Master found that the bylaws were properly adopted by BWMC.[16] The Master also considered the facial validity of each of the ten bylaws to which Ms. Beck objected, finding eight bylaws to be valid and two bylaws to be invalid. For the two invalid bylaw provisions, the Master's Final Report recommended specific modifications to each provision that would remedy their invalidity.[17] The Master recommended that the Court approve the bylaws, subject to those changes.

---

[12] D.I. 215, 216, 217, 218.

[13] D.I. 222.

[14] D.I. 223.

[15] D.I. 235.

[16] *Id.* at 24.

[17] *Id.*

On June 4, 2020, Ms. Beck filed a notice of exceptions to the Master's Final Report,[18] followed by a brief in support of her exceptions on July 7.[19]  Ms. Beck's exceptions consisted largely of the same objections to the bylaws that she had previously raised before Master Griffin.  On July 24, Mr. Greim submitted to the Court an updated version of the bylaws, as amended to incorporate the Master's recommended modifications (the "New Bylaws").[20]  The New Bylaws additionally adopted one of Ms. Beck's proposed changes, rendering that objection moot.  Ms. Beck then submitted a reply brief on September 11, 2020.[21]  This is my ruling on the exceptions to the Master's Final Report.

## II.    Standard of Review and Applicable Authorities

"The standard of review for a master's findings—both factual and legal—is *de novo*."  *DiGiacobbe v. Sestak*, 743 A.2d 180, 184 (Del. 1999).  As our Supreme Court has held, a new trial is not required merely because exceptions are taken to a Master's report.  "Only where exceptions raise a *bona fide* issue as to dispositive

---

[18] D.I. 236.  Ms. Beck submitted the notice of exceptions within the time required by Court of Chancery Rule 144, and the Court granted her request to extend the deadline for filing an opening brief in support of the exceptions.  D.I. 238.  Ms. Beck's opening brief will be cited herein as "Exceptions to the Master's Final Report."

[19] D.I. 241.

[20] D.I. 246.

[21] D.I. 252.

credibility determinations will a new hearing be inevitable. In those cases the new hearing can be limited to the witness or witnesses whose credibility is at issue." *Id.* My review of the Master's Final Report reveals that none of the exceptions raises a *bona fide* issue as to dispositive credibility issues. Therefore, a trial is not warranted.

The contents of BWMC's bylaws, as well as the procedures for their adoption, are governed by both internal authorities and external authorities. Internal authorities include the Certificate of Incorporation of Bombay Woods Maintenance Corporation ("Certificate"),[22] the Amended and Restated Maintenance Declaration and Declaration of Restrictions Applicable to Bombay Woods ("Declaration"),[23] and the bylaws in effect at the time of the New Bylaws' adoption ("Existing Bylaws").[24] These internal authorities will be referred to collectively as the "BWMC Governing Documents." External authorities include the April 23, 2019 Court Order, the Delaware General Corporation Law ("DGCL"), and the Delaware Uniform Common Interest Ownership Act ("DUCIOA"). Because BWMC predates the enactment of the DUCIOA, it is classified as a pre-existing common interest

---

[22] The Certificate is attached to the original complaint, D.I. 1, as Exhibit 16.

[23] The Declaration is attached to the original complaint, D.I. 1, as Exhibit 17.

[24] The Existing Bylaws are attached to the original complaint, D.I. 1, as Exhibit 20.

community, and only specified DUCIOA sections apply to BWMC.[25]  If there is a conflict between an applicable DUCIOA section and a provision in the BWMC Governing Documents, the DUCIOA section will control.  Inapplicable DUCIOA sections, on the other hand, only control on matters that are not addressed in the BWMC Governing Documents.[26]

### III.    Exceptions to the Master's Final Report

Ms. Beck takes exception to the Master's conclusion that the New Bylaws were validly adopted and are facially valid.  Ms. Beck's exceptions substantially reiterate the objections that she raised before the Master.

#### A.    *Objection to the Bylaw Voting Procedures*

Ms. Beck contends that the New Bylaws were not properly adopted by the Members of BWMC.  Ms. Beck argues that the 38 unanimous votes in favor of the New Bylaws were insufficient to adopt the New Bylaws.  To be valid, the bylaw vote must satisfy the applicable quorum requirement and the applicable voting requirement.  In this case, I find that both requirements are satisfied.

---

[25] 25 *Del. C.* § 81-119.  The Declaration was executed on January 3, 2002.  Declaration, at 1.  The DUCIOA became effective on September 30, 2009.  25 *Del. C.* § 81-116.

[26] *Id.* § 81-119.

### 1. The Quorum Requirement

Under the Existing Bylaws, "[t]he presence at the meeting of Members entitled to cast, or of proxies entitled to cast, fifty-one (51%) percent of the total votes authorized to be voted shall constitute a quorum for any action except otherwise provided in the Certificate of Incorporation, the Maintenance Declaration, or these Bylaws."[27] None of the other BWMC Governing Documents provides otherwise. The April 23, 2019 Court Order, however, expressly established a different quorum requirement for the vote on the New Bylaws:

> The [Members] who vote in the Election or at the Meeting [held to vote on the adoption of bylaws] shall constitute a quorum, notwithstanding any quorum requirement elsewhere to the contrary.[28]

---

[27] Existing Bylaws, Art. III, § 8. The DUCIOA addresses quorum requirements, but those requirements only apply "[u]nless the bylaws provide otherwise." 25 *Del. C.* § 81-309(a). BWMC's Existing Bylaws provide otherwise.

[28] April 23, 2019 Court Order, ¶ 11. Unlike the law of other states, *e.g. Cal. Corp. Code* § 7515(c), Delaware law does not expressly authorize courts to establish ad hoc quorum requirements except in an action to compel an overdue annual meeting to elect directors. *See* 8 *Del. C.* § 211(c) (stock corporations); *id.* § 215(d) (nonstock corporations). The DUCIOA does state, however, that "[t]he principles of law *and equity*, including the law of corporations . . . supplement the provisions of [the DUCIOA]." 25 *Del. C.* § 81-108 (emphasis added). This Court has previously used its equitable powers to establish quorum requirements in certain circumstances. *See Dolby v. Key Box "5" Operatives, Inc.*, 1994 WL 507881 (Del. Ch. Sept. 8, 1994). In *Dolby*, the Court ordered the organization of a new community association after the entity previously in charge of the community's maintenance had breached its fiduciary duties. The new association was ordered to adopt a bylaw providing that the members who attended the organizational meeting would constitute a quorum. *Id.* at \*15 The Court justified the unique remedy, in general, by noting that "[i]t is the particular and historical function of equity courts to fashion rules that vindicate rights for which formal legal remedies cannot furnish redress." *Id.* at \*14.

8

Thirty-eight out of the 152 Members, or 25%, were present at the meeting to vote on the New Bylaws.[29]   Although a turnout of 25% would not constitute a quorum under the Existing Bylaws, it satisfies the April 23, 2019 Court Order's provision, which overrides the Existing Bylaw's requirement and allows for any percentage to constitute a quorum for the purpose of voting to adopt bylaws. Therefore, the 38 Members present constituted a valid quorum to consider the New Bylaws.

### 2. *The Voting Requirement*

The Existing Bylaws contain the only applicable voting requirement for adopting or amending bylaws:  "These Bylaws may be amended, altered, repealed or added to at any regular meeting of the Members or at any special meeting called for that purpose, by affirmative vote of seventy-five percent (75%) of the votes cast

---

The Court's equitable authority to reduce the quorum requirement governing BWMC's bylaw approval process is further supported by the Delaware General Assembly's apparent leniency towards quorum requirements for nonstock corporations. *Compare* 8 *Del. C.* § 216 (requiring stock corporation to establish for the transaction of any business a quorum requirement of at least one-third of the shares entitled to vote), *with* 8 *Del. C.* § 215 (not requiring any minimum quorum requirement for nonstock corporations); *see also Fairthorne Maint. Corp. v. Ramunno*, 2007 WL 2214318, at *6 (Del. Ch. July 20, 2007) ("This distinction recognizes the reality that many non-profit entities would be unable to function if required to amass a certain number of their members to conduct business.").  In any event, Ms. Beck does not take exception to the Court's authority to establish a quorum requirement.

[29] D.I. 222, at 2.

by the Members of the Corporation at any time."[30]  All 38  of the votes cast by the Members in attendance at the meeting were voted in favor of the New Bylaws. Therefore, the voting requirement was satisfied.

Ms. Beck makes two arguments for why the 38 votes were not sufficient to adopt the New Bylaws.  First, Ms. Beck argues that the 114 Members who did not vote should be counted as votes against the New Bylaws.[31]  That argument, however, is contrary to the plain language of the Existing Bylaws, which only counts "votes cast" toward the 75% voting threshold.  As the Master's Final Report recognized, the phrase "votes cast" requires "an affirmative act of voting."[32]  Members who did not attend the meeting did not cast votes one way or the other, and their lack of participation is not a consideration in determining whether the voting requirement has been satisfied.

Second, Ms. Beck argues that the New Bylaws may not be adopted by a minority of the total Members, regardless of quorum or voting requirements.  Ms. Beck points to various provisions in the Declaration that require certain decisions to

---

[30] Existing Bylaws, Art. XIV.  The DUCIOA contains voting requirements, but these do not apply to Bombay Woods, a pre-existing community.  25 *Del. C.* §§ 81-310; *see id.* § 81-119.

[31] Exceptions to the Master's Final Report, at 9.

[32] Master's Final Report, at 9.

be approved by an absolute supermajority of all BWMC Members. Ms. Beck contends that these provisions indicate a general "spirit and intent" of the Declaration to require a similar absolute majority when adopting or amending bylaws.[33]

The Declaration requires consent from three-quarters of the Members in order to amend "the covenants, agreements, conditions, reservations, restrictions and charges created and established herein."[34] The New Bylaws, however, are not created nor established in the Declaration. Therefore, this provision of the Declaration does not control the process for amending the bylaws.

The Declaration also states that "[b]y a two-thirds (2/3) vote of its members, BWMC may take such other action for the benefit of the lands governed hereby."[35] This requirement is general and does not apply specifically to adopting bylaws. It also uses permissive language and does not prohibit amending the bylaws with the approval of fewer than two-thirds of all Members. Because the Existing Bylaws' provision is specific to voting on bylaws and can be harmonized with this general

---

[33] Exceptions to the Master's Final Report, at 6.

[34] Declaration ¶ 22.

[35] *Id.*, ¶ 20(h).

provision of the Declaration, the more specific provision controls.[36] It was sufficient for the New Bylaws to be adopted in accordance with the specific provisions that did not require supermajority approval.

Because the vote on the New Bylaws satisfied both the quorum requirement and the voting requirement, the exceptions challenging the procedure for adopting the New Bylaws are denied.

### B. *Objections to Specific Bylaws*

Ms. Beck's Exceptions to the Master's Final Report include both legal challenges as well as recommended improvements to the New Bylaws. This Letter Opinion, however, does not decide what BWMC should and should not include in its bylaws as a matter of good policy or best practices. Rather, this Letter Opinion concerns what BWMC must and must not include in its bylaws, as required by law.

### 1. *Objection to Provision for Adding Properties*

Article II, Section 1 of the New Bylaws states that "members may, with a 75% vote, add new properties to the Corporation and the Maintenance Declaration and these bylaws shall be amended to reflect such additional properties." When this

---

[36] *Cf. Adams v. Calvarese Farms Maint. Corp., Inc.*, 2010 WL 3944961, at *13 (Del. Ch. Sept. 17, 2010) ("[T]o the extent a bylaw or a provision of a certificate of a homeowners maintenance corporation cannot be harmonized with a provision of a real covenant governing the homeowners maintenance corporation, the [covenant controls].").

provision was initially adopted, it permitted the Members to add new properties

"with a 75% vote of the votes cast." The Master's Final Report recommended that

the words "of the votes cast" be struck, so that the bylaw would comply with the

Declaration's requirement that 75% of Bombay Woods owners must provide written

consent to add new properties.[37] The New Bylaws, as currently before this Court,

have incorporated the Master's recommendation.

Despite the new wording, Ms. Beck argues that this provision is still facially

invalid. Ms. Beck asserts that, according to the Declaration, adding a new property

requires creating a subdivision. The Declaration states that "[s]o long as Declarant

owns any lot or lots subject to this Declaration, . . . Declarant may cause a

resubdivision of Bombay Woods to be made which resubdivision may add additional

lands or lots, reconfigure or subdivide existing lots, or make other changes Declarant

deems advisable . . . ."[38] The Declaration defines the "Declarant" to be Bombay

Woods, LLC. This provision of the Declaration is inapposite because: (1) it does

not require a resubdivision but, rather, permits a resubdivision under certain

---

[37] Master's Final Report, at 11–12. *See* Declaration, ¶ 22.

[38] Declaration, ¶ 22.

circumstances, and (2) it applies to Bombay Woods, LCC, not BWMC. Therefore, the provision of the New Bylaws is not facially invalid.[39]

### 2. *Objection to Requirements for Special Meetings*

Article III, Section 2 of the New Bylaws provides: "Special meetings of the Members may be called at any time by the President or by a majority of the Board of Directors, or upon written request of the Members who are entitled to vote twenty-five percent (25%) of all the membership votes." Most of Ms. Beck's objections to this provision concern whether this provision will be a hindrance on efforts to keep the community actively involved in BWMC's affairs. While Ms. Beck's desire to promote community involvement is commendable, disagreements over policy preferences are not adequate grounds for this Court to invalidate the proposed bylaw.

Ms. Beck also makes two legal challenges to this provision.[40] First, she cites *Hockessin Community Center, Inc. v. Swift*[41] for the proposition that "the [M]embers have equal power of the corporation, there are no real boards or directors," and thus

---

[39] Ms. Beck also asserts that this bylaw would violate DUCIOA provisions that protect owners' easement rights to common elements and require additional units to be previously reserved on a plat or plan. Exceptions to the Master's Final Report, at 14. This argument is unavailing because the provisions that Ms. Beck cites do not apply to Bombay Woods, a pre-existing community. 25 *Del. C.* §§ 81-209, 81-216; *see id.* § 81-119.

[40] Exceptions to the Master's Final Report, at 15.

[41] 59 A.3d 437 (Del. Ch. 2012).

Members should be equally empowered to call special meetings. The cited passage from *Hockessin Community Center*, however, explains that nonstock corporations can have the same governance structure as stock corporations, even though different terminology may be used.[42] Regardless of nomenclature, members of the Board still have authority that differs from that of the corporation's general members.[43]

Second, Ms. Beck cites a provision of the Declaration which states that Bombay Woods, LLC may transfer "control of the [Architecture Review Committee (ARC)] and rights to the homeowners and/or the BWMC. Thereafter, the powers and duties of the ARC, as enumerated in this Declaration of Restrictions, shall become vested in [BWMC]." [44] Ms. Beck appears to contend that this transfer of control and rights also grants to any BWMC Member the ability to call special meetings. The Declaration does not support Ms. Beck's contention. It is not reasonable to construe a single reference to "rights," in the midst of multiple paragraphs discussing the ARC and its duties, as including an ability to call special meetings or establishing that the ability to do so has been transferred to each

---

[42] *Id.* at 455–56. For example, nonstock corporations may have "members of the governing body of the corporation" instead of a "members of the board of directors." *See* 8 *Del. C.* § 114(a).

[43] *Hockessin*, 59 A.3d at 456–57.

[44] Declaration, ¶ 4.

individual homeowner. This is particularly true where the powers and duties of the ARC relate to approving construction and other improvements to the properties, rather than managing BWMC's affairs.[45]

Because this provision does not violate any law or BWMC Governing Document, I find that it is facially valid and I deny the exception.

### 3. Objection to Quorum Requirements

Article III, Section 4 of the New Bylaws provides that "the members or proxies entitled to cast thirty-three (33) percent of eligible homeowners voting of the membership shall constitute a quorum on any action except as otherwise provided in the [BWMC Governing Documents]." Ms. Beck takes issue with the phrase "eligible homeowners," as well as phrases such as "members or proxies entitled to cast" that are used in the New Bylaws.[46] Ms. Beck argues that these are "words of discrimination" that create improper classifications. These phrases, however, do not facially discriminate against any protected class of individuals.[47] Instead, they are a

---

[45] *See id.* ¶¶ 3–5.

[46] Exceptions to the Master's Final Report, at 16. Ms. Beck also argues that this provision is invalid because it contradicts the Declaration, which requires that certain decisions be approved by a higher percentage of all BWMC Members. *Id.* This argument fails because, by the provision's own terms, the New Bylaws' quorum requirement will not apply in situations where the Declaration imposes any requirement to the contrary.

[47] *See* 42 U.S.C. § 3604.

reference to the conditions for voting eligibility outlined in the Declaration, which include that "[a]ll of the record owners shall be entitled to one (1) vote for each lot in which they hold an interest . . . but in no event shall more than one (1) vote be cast with respect to any lot."[48]  The New Bylaws further protect the voting rights of all Members by stating that "[a]ll owners shall be entitled to one vote for each lot owned."[49]  There is no basis to infer discrimination from these provisions, and the quorum requirement provision of the New Bylaws is facially valid.

### 4.  Objection to Board Member Qualifications

Article IV, Section 1 of the New Bylaws requires that "[a]ll directors must be members of the BWMC and in good standings [sic] with BWMC." Ms. Beck argues that the "good standing" qualification is impermissible because it is vague and may be subjectively applied.[50]

The DGCL permits a corporation's bylaws to establish the qualifications for directors.[51]  A qualification is not *per se* unreasonable if a trial court can fairly

---

[48] Declaration, ¶ 20(i).

[49] New Bylaws, Art. III, § 7.  The originally proposed bylaws had permitted the Board to restrict voting rights.  At the Master's request, BWMC removed that provision from the New Bylaws.  *See* D.I. 246, at 1.

[50] Exceptions to the Master's Final Report, at 16.

[51] 8 *Del. C.* § 141(b).

determine its meaning.[52]  Furthermore, the U.S. Supreme Court has approved of a "good standing" qualification for the board of directors of national labor organizations,[53] and a California state appellate court has approved of a "good standing" requirement for board members of a homeowners' association.[54]  If disputes arise over the determination of whether a potential Board candidate is in "good standing," a court can resolve that future dispute in an as-applied challenge to this bylaw provision.  This provision of the New Bylaws is not facially invalid.

### 5.  Objection to Board Size and Terms

Article IV, Section 1 of the New Bylaws provides that the affairs of BWMC shall be managed by a Board of Directors having an odd number of directors, preferably three or five.  Ms. Beck argues that the New Bylaws should instead permit the Board to have as few as one member and that the Board members should be prohibited from serving consecutive terms.[55]

---

[52] *Stroud v. Grace*, 606 A.2d 75, 93 (Del. 1992) (holding that a provision requiring directors to have "substantial experience" was not so vague as to render the qualification unreasonable per se).

[53] *Wirtz v. Hotel, Motel & Club Employees Union, Local 6*, 391 U.S. 492, 499 (1968); *see also* 29 U.S.C. § 481.

[54] *Friars Vill. Homeowners Assn. v. Hansing*, 162 Cal. Rptr. 3d 818, 826 (Cal. App. 4th 2013).

[55] Exceptions to the Master's Final Report, at 36, 57.

No law or BWMC Governing Document prohibits BWMC from having a Board of Directors consisting of three or five members who may serve consecutive terms.[56] The DUCIOA even requires that the executive board of a homeowners' association have at least three members.[57] This provision of the New Bylaws is facially valid.

### 6. *Objection to Notice of Board Meetings*

Article IV, Section 1 of the New Bylaws states: "Regular meetings of the Board of Directors shall be held at least annually without notice at such place, date and hour as may be fixed from time to time by resolution of the Board." Ms. Beck argues that the DUCIOA requires the Board to give advance notice to Members. The DUCIOA contains several requirements for notice, member participation, and other procedures at Board meetings.[58] None of these provisions, however, applies to BWMC, because it is a pre-existing community and its bylaws address the notice requirement.[59] Therefore, this provision of the New Bylaws is facially valid.

---

[56] For support, Ms. Beck cites 8 *Del. C.* § 141(b), which states that the board "shall consist of one or more members," but she does not consider the next sentence: "The number of directors shall be fixed by, or in the manner provided in, the bylaws, unless the certificate of incorporation fixes the number of directors . . . ."

[57] 25 *Del. C.* § 81-303(e). This provision applies to BWMC. *See id.* § 81-119.

[58] *See* 25 *Del. C.* §§ 81-308, 81-308A.

[59] *Id.* § 81-119.

### 7. *Objection to Board's Power to Regulate Use of Common Areas*

Article VII, Section 1(a)–(b) of the New Bylaws authorizes the Board to adopt rules and regulations governing the use of the common areas, including the ability to establish penalties for infractions and suspend rights of a member to use the common areas. Ms. Beck argues that the Declaration prohibits the Board from restricting the rights of Members to access the common areas.[60]

Ms. Beck cites two provisions in particular. The first states that BWMC's Members "shall be all of the record owners of the land within Bombay Woods."[61] That language does not mean that BWMC's Members are record owners of all of the land within Bombay Woods. Contrary to Ms. Beck's assertions, limiting a Member's use of the common areas is not tantamount to revoking that Member's status and would not "require adopting a provision [in the Declaration] to remove a unit from the entire plot."[62] To be sure, the Declaration also provides that Members are "bound by all of [BWMC's] rules and regulations,"[63] and the DUCIOA gives

---

[60] Ms. Beck cites a number of other DUCIOA provisions to further support her argument, but none of those provisions applies to BWMC, a pre-existing community. 25 *Del. C.* §§ 81-205, 81-208, 81-216, 81-213, 81-312; *see id.* § 81-119.

[61] Declaration ¶ 20.

[62] Exceptions to the Master's Final Report, at 21.

[63] *Id.* ¶ 20(a).

BWMC the ability to "regulate the use . . . of common elements."[64] Because the Certificate authorized the Board to manage the affairs and business of BWMC, the Board is authorized to regulate the use of common areas.[65]

The second cited provision states that the Declaration is "imposed for the equal benefit of each lot or parcel of land included within [Bombay Woods]."[66] Imposing restrictions on individual members is not inconsistent with protecting the "equal benefit of each lot" and "the common safety and well-being of residents of Bombay Woods."[67] The DUCIOA recognizes that a board may, for example, "suspend any privileges of unit owners [or] services to unit owners" for non-payment of assessments or "levy reasonable fines" for violations of the rules.[68] These powers are subject to limitations, including that a board "shall use its reasonable judgment" and "not be arbitrary or capricious."[69] Although Article IV, Section 1(a)–(b) could under certain scenarios be subject to an as-applied challenge, it is facially valid.

---

[64] 25 *Del. C.* § 81-302(a)(6).

[65] Certificate, ¶ 9.

[66] Declaration, at 1.

[67] *Id.*; *see also id.* ¶ 20.

[68] 25 *Del. C.* § 81-302(a)(11).

[69] *Id.* § 81-302(f). Ms. Beck quotes substantially from previous filings in this case to refute the Master's finding that, "[a]lthough Beck expresses concerns about the Board's fairness in imposing sanctions, she has offered no evidence showing the Board has acted improperly related to common area usage in the past." Even though this dispute originated from Ms.

### 8. *Objection to Board's Power to Employ Contractors*

Under Article VII, Section 1(c) of the New Bylaws, the Board may "employ an independent contractor, professionals or such other employees or contractors as they deem necessary, and to prescribe their duties." Ms. Beck disagrees with the Board's past hiring decisions, but she does not make any legal challenge to this bylaw provision.[70] The DUCIOA permits BWMC to "hire and discharge managing agents and other employees, agent, and independent contractors,"[71] and BWMC acts by and through its Board of Directors.[72] The Board therefore has discretion to determine which contractors to hire, provided that it acts with care and loyalty to BWMC.[73] This bylaw provision is facially valid.

### 9. *Objection to the Board's Power to Increase the Annual Assessment*

Under Article XI of the New Bylaws, "the annual assessment may be increased each year not more than 10% above the assessment from the previous year without a vote of the BWMC membership." Ms. Beck argues that this provision is

---

Beck's concern regarding the maintenance of common areas, the Board's ensuing actions, however fair or unfair they may have been, were not related to the common areas nor the regulation of use thereof. *See* Exceptions to the Master's Final Report, at 30–36.

[70] Exceptions to the Master's Final Report, at 25–26.

[71] 25 *Del. C.* § 81-302(a)(3).

[72] Certificate, ¶ 9.

[73] 25 *Del. C.* § 81-303(a).

invalid because it contradicts the Declaration's procedures for approving the annual assessment.[74]

The Declaration states that "[a]n annual assessment, if necessary, shall be set by a majority vote of the members who are voting in person or by proxy at the annual meeting."[75]   That provision of the Declaration, however, conflicts with the DUCIOA's procedures for setting an annual assessment.  The DUCIOA states that "assessments must be made at least annually, based on a budget adopted at least annually by the association."[76]  The DUCIOA also establishes detailed procedures for adopting the budget, including that it must be proposed by the Board and ratified by the Members.[77]  These DUCIOA provisions all apply to Bombay Woods.[78]

Because the Declaration states that the assessment must be set by a direct vote of the Members and the DUCIOA states that the assessment must be based on a budget, there is a conflict between the two provisions.  In the event of a conflict, the provisions of the DUCIOA prevail.[79]  The New Bylaws' procedure for increasing

---

[74] Exceptions to the Master's Final Report, at 25.

[75] Declaration, ¶ 20(c).

[76] 25 *Del. C.* § 81-315(a)(2).

[77] *Id.* § 81-324.

[78] *Id.* § 81-119.

[79] *Id.*

the annual assessment without a vote does not conflict with the DUCIOA, because the statute does not require a separate vote to set the annual assessment.

Because this provision of the New Bylaws does not conflict with the DUCIOA, and because the DUCIOA controls on this matter instead of the Declaration, the provision is facially valid. As the Master's Final Report noted, however, this bylaw provision could be invalidly applied if the increase in annual assessment is not based on a duly adopted budget, pursuant to the DUCIOA.[80]

### 10. Objection to Certificates of Assessment Payment

Article VII, Section 21(c)(2) of the New Bylaws provides that the members of the Board have the duty to "issue . . . upon demand by any person, a certificate setting forth whether or not any assessment has been paid," and that the certificate "shall be conclusive evidence of such payment or nonpayment." Ms. Beck argues that Members should be able to establish the payment status of a property's assessment by their own proof of payment.[81]

Nothing in the BWMC Governing Documents contradicts or prohibits this provision. Furthermore, the DUCIOA requires that, upon request, BWMC "shall furnish to a unit owner a statement setting forth the amount of unpaid assessments

---

[80] Master's Final Report, at 24.

[81] Exceptions to the Master's Final Report, at 26–27.

24

against the unit."[82]  The statement "is binding on the association, the executive board, and every unit owner."[83]  Thus, this provision of the New Bylaws is consistent with statutory the requirements and is facially valid.

### 11. Objection to Lack of Mandatory Audits

The New Bylaws do not require audits of BWMC's finances.  Ms. Beck argues that an annual independent audit should be mandatory.  Ms. Beck relies on Section 81-306 of the DUCIOA, which requires independent audits by a licensed certified public accounting firm.  That provision, however, only applies to "a condominium and cooperative with more than 50 unit owners."[84]  Because BWMC is a common interest community, rather than a condominium or a cooperative, that provision of the DUCIOA is inapplicable.[85]

The DUCIOA also enumerates the documents that an association is required to maintain in writing, which include "any financial statements and tax returns of the association prepared for the past 3 years, together with the report of the auditors of the financial records."[86]  The qualified phrase "*any* financial statements and tax

---

[82] 25 *Del. C.* § 81-316(h).  This section applies to pre-existing communities.  *Id.* § 81-119.
[83] *Id.*
[84] 25 *Del. C.* § 81-306.
[85] *See id.* § 81-103(11)–(12).
[86] *Id.* §81-318(a)(4).

returns" suggests that this section imposes an obligation only to maintain these records once created, not a duty to generate these records.

Because no statute or BWMC Governing Document compels BWMC to perform an annual audit, the New Bylaws are not required to include such a provision.

## IV. Fee Request

Ms. Beck requests compensation from BWMC for her time spent researching and raising objections to the New Bylaws.[87] Delaware courts follow the American Rule and generally hold each litigant responsible for its own litigation fees and expenses.[88] One exception is when the Court, in its discretion, awards fees and expenses to one party because the other has acted in bad faith.[89] "The bad faith exception is not lightly invoked," and it is only appropriate when there is clear evidence of subjective bad faith.[90] I am not persuaded that the Board or the Members of BWMC acted in any such bad faith when approving the New Bylaws or defending

---

[87] D.I. 243, at 1; D.I. 244 (submitting an invoice to BWMC).

[88] *Goodrich v. E.F. Hutton Grp., Inc.*, 681 A.2d 1039, 1044 (Del. 1996).

[89] *Auriga Capital Corp. v. Gatz Properties*, 40 A.3d 839, 880 (Del. Ch. 2012).

[90] *Id.*

their validity. These circumstances do not justify departing from the American Rule, and Ms. Beck is not entitled to compensation from BWMC.

## V.     Conclusion

Having conducted a *de novo* review of the issues raised in the Exceptions to the Master's Final Report, I deny the exceptions and affirm the Master's well-reasoned decision. Accordingly, for the reasons set forth herein, the Court finds that the New Bylaws were validly adopted and are facially valid. Pursuant to the April 23, 2019 Court Order, the New Bylaws, as now approved by this Court, shall be recorded and shall govern BWMC. Ms. Beck's exceptions and her request for compensation from BWMC are denied.

**IT IS SO ORDERED.**

Very truly yours,

*/s/ Paul A. Fioravanti, Jr.*

Vice Chancellor

PAF/dtw